Mary Anne MAURER, Property Tax Administrator, State of Colorado, Petitioner,

v.

YOUNG LIFE, formerly the Young Life Campaign; and The Board of Assessment Appeals, State of Colorado, and its members, Henry F. Schiver, Chairman, Joy C. Carpenter, and James T. McDonald, Respondents.

No. 87SC481.

Supreme Court of Colorado,
En Banc.

Sept. 18, 1989.

Rehearing Denied Oct. 23, 1989.

Duane Woodard, Atty. Gen., Charles B. Howe, Chief Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Larry A. Williams, First Asst. Atty. Gen., Denver, for petitioner.

Holme Roberts & Owen, Richard R. Young and Susan D. Campbell, Colorado Springs, for respondents.

Kenneth A. Baker, Chaffee County Atty., Salida, for amicus curiae Bd. of County Com'rs of Chaffee County.

Justice LOHR delivered the Opinion of the Court.

We granted certiorari to review the judgment of the Colorado Court of Appeals in *Maurer v. Young Life*, 751 P.2d 653 (Colo. App.1987). The issues presented in this case are whether the Property Tax Administrator of the State of Colorado (Administrator) has standing to appeal from a ruling of the Board of Assessment Appeals (Board) granting an application for an exemption from property taxes and, if so, whether the Board erred in awarding such an exemption to Young Life for the tax years 1976 through 1984. We hold that the Administrator has standing, and is authorized to bring such an appeal for the tax year 1984 pursuant to section 39–2–117(6), 16B C.R.S. (1988 Supp.), but that section 24–4–106(4), 10A C.R.S. (1988), which governed rights of appeal for earlier years, did

not permit the Administrator to seek judicial review.[1] We also hold that the Board's action in granting the exemption for the tax year 1984 is legally correct and factually supported by the record. Because the court of appeals held that the Administrator lacked standing to appeal from the Board's decision for any of the tax years at issue and affirmed the district court's judgment of dismissal of the Administrator's appeal for that reason, we affirm the court of appeals' judgment as to tax years 1976 through 1983 but reverse that judgment as to tax year 1984 and affirm the decision of the Board for that latter year. The effect of this decision is to leave unreviewed and in force the Board's decision granting Young Life's exemption application for the tax years 1976 through 1983 and to affirm on the merits the Board's decision granting such application for the tax year 1984.

I.

Young Life is a nonprofit corporation organized under the laws of Texas. Its purposes include the promotion of an evangelistic Christian testimony among adolescents. According to its articles of incorporation, the organization seeks to introduce the Christian gospel to young people, particularly those without a church affiliation. It also seeks to encourage Christian young people in the development of their spiritual lives and to promote their participation in the activities of their respective churches. One Young Life activity in furtherance of such purposes is the development of camping programs during which Christian teachings are related to camping experiences in a low-key, informal manner.

At all times relevant to this opinion, Young Life owned properties in the Chalk Creek Drainage in Chaffee County, Colorado, consisting principally of Frontier Ranch, Silver Cliff,[2] Trail West and Rancho Caballo. Frontier Ranch and Silver Cliff were used for youth camps during the years in question. Trail West was a lodge used for Christian retreats. Rancho Cabal-

---

1. For convenience we sometimes refer to the judicial review proceedings contemplated by § 24–4–106(4) as "appeals."

2. Silver Cliff was sold by Young Life in 1984.

lo was a ranch where horses were raised for use in the camping programs at the other three properties.

This case had its inception in 1976 when Young Life filed an application for an exemption from property taxes with the Administrator with respect to the Chaffee County properties. *See* § 39–2–117, 16B C.R.S. (1982). It sought such an exemption based on the use of the properties for religious worship and for charitable purposes. *See* § 39–3–101(1)(e), (g). The Administrator denied the application, and Young Life appealed to the Board pursuant to section 39–2–117(5). The Board held a hearing and then remanded the case to the Administrator for consideration of certain matters the Administrator had not previously taken into account. The Administrator again denied the application and Young Life once more appealed. The Board held a four-day evidentiary hearing concluding on September 13, 1984, after which it issued a written decision on October 26, 1984, reversing the decision of the Administrator and directing the Administrator to grant the requested exemption, based on the use of the properties for religious worship, retroactive to January 1, 1976.

The Administrator sought review in Chaffee County District Court. Young Life and the Board moved to dismiss, asserting that the Administrator had no standing to appeal. The district court agreed and granted the motion to dismiss. On appeal, the court of appeals affirmed the dismissal. *Maurer v. Young Life*, 751 P.2d 653, 657 (Colo.App.1987). We granted certiorari to determine whether the Administrator could appeal from the decision of the Board and, if so, whether the Board erred in awarding an exemption to Young Life for its Chaffee County properties.[3]

## II.

In affirming the decision of the district court, the court of appeals adopted as its own the district court's order that the Administrator lacked standing to seek judicial review of the Board's decision. *Maurer,*

751 P.2d at 653. The Administrator argues that standing is proper under section 39–2–117(6), 16B C.R.S. (1988 Supp.). That statute, however, was enacted in 1983 and applies only "to property tax years commencing on or after January 1, 1984." Ch. 520, secs. 1 and 6, § 39–2–117, 1983 Colo.Sess. Laws 2086, 2088. In this case, the Administrator sought review of the Board's determination of Young Life's tax exemption for the 1976 through 1984 property tax years. Because section 39–2–117(6) applies only to the 1984 property tax year, we will examine separately the issue of the Administrator's standing for the 1984 property tax year and for the 1976 to 1983 property tax years.

### A.

#### *1984 Property Tax Year*

Young Life contends that for all the property tax years at issue, the Administrator lacks standing to seek judicial review of the Board's decision under *Martin v. District Court,* 191 Colo. 107, 550 P.2d 864 (1976). In *Martin,* we held that

[i]n the absence of an express statutory right, a subordinate state agency ... lacks standing or any other legal authority to obtain judicial review of an action of a superior state agency.... *Nadeau* [*v. Merit System Council,* 36 Colo.App. 362, 545 P.2d 1061 (1975)]; see *Board of County Commissioners v. State Board of Social Services,* 186 Colo. 435, 528 P.2d 244 (1974); and *Board of County Commissioners v. Love,* 172 Colo. 121, 470 P.2d 861 (1970).

191 Colo. at 109, 550 P.2d at 866. The *Martin* standard thus precludes standing when two conditions are met: (1) the agency seeking judicial review is subordinate to the agency whose decision is sought to be reviewed, and (2) no statutory provision confers a right on the subordinate agency to seek judicial review of the superior agency's decision. *See State v. Colorado State Personnel Board,* 722 P.2d 1012, 1018–19 (Colo.1986) (state department of personnel

---

**3.** Certain small portions of Young Life's Chaffee County properties were not included in the request for exemption or in the exemption granted by the Board.

lacks standing to seek judicial review of decision of state personnel board); *Ad Hoc Executive Committee v. Runyan*, 716 P.2d 465, 469–70 (Colo.1986) (public county hospital executive committee does not have standing to seek judicial review of decision of hospital board of trustees).

In the present case, Young Life asserts that the Administrator is a state agency subordinate to the Board and that section 39–2–117(6) does not constitute statutory authority granting the Administrator a right to seek judicial review of adverse Board decisions. Even assuming that the Administrator is subordinate to the Board for purposes of the *Martin* analysis, we conclude that section 39–2–117(6) constitutes statutory authority for the Administrator to seek review of adverse Board decisions under the circumstances specified in the statute.[4] Therefore, Young Life's reliance on *Martin* is inadequate to demonstrate that the Administrator lacked standing.

1.

■ Section 39–2–117(6) outlines the availability of judicial review of Board decisions on appeals from the Administrator's determinations on property tax exemption applications. This section provides in part that

> [i]f the decision of the board is against the respondent, the respondent, upon the recommendation of the board that it is a matter of statewide concern and within thirty days after such decision, may petition the district court of the county in which the property is located for judicial review pursuant to section 24–4–106, [10A] C.R.S. [1988].

§ 39–2–117(6), 16B C.R.S. (1988 Supp.).

The Administrator argues that because she was the respondent in Young Life's appeal before the Board, section 39–2–117(6) allows the Administrator to seek district court review of the Board's decision since the decision reversed the Administrator's prior exemption determination (i.e.,

was a decision "against the respondent") and the Board certified the matter as one of statewide concern. If the Administrator's interpretation is correct, section 39–2–117(6) would constitute a statutory provision conferring a right on the Administrator to seek judicial review of the Board's decision so that *Martin* would not preclude the Administrator's standing here. *See Martin*, 191 Colo. at 109, 550 P.2d at 866; *Personnel Board*, 722 P.2d at 1018–19; *Runyan*, 716 P.2d at 469–70.

The court of appeals, adopting the order of the district court, held that section 39–2–117(6) did not confer upon the Administrator a right to seek judicial review of the Board's decision. *Maurer v. Young Life*, 751 P.2d at 657. The court of appeals concluded that a grant of a right to seek judicial review under section 39–2–117(6) would be inconsistent with section 24–4–106(4) of the State Administrative Procedure Act, which provides for judicial review only by "persons" and not by agencies. 751 P.2d at 656. Because section 39–2–117(6) provides for judicial review pursuant to section 24–4–106, the court of appeals reasoned that a finding that the Administrator was entitled to review under section 39–2–117(6) would result in a repeal of portions of section 24–4–106 by implication, and it was unable to discover in section 39–2–117(6) an implied legislative intent to effect such a repeal. 751 P.2d at 656–57. We conclude that the court of appeals failed to apply the proper considerations in construing section 39–2–117(6).

The starting point in statutory interpretation is the language of the statute itself. *State Bd. of Equalization v. American Airlines*, 773 P.2d 1033, 1040 (Colo.1989). "Where the statutory language is clear and unambiguous there is no need to resort to interpretative rules of statutory construction; the statute, in that instance, should be applied as written, since it may be presumed that the General Assembly meant what it clearly said." *Griffin v. S.W. Devanney & Co.*, 775 P.2d 555, 559 (Colo.

---

**4.** Because we may assume for purposes of this opinion that the Administrator is subordinate to the Board, we do not find it necessary to decide the issue of the Administrator's relation to the Board.

1989). Here, the plain language of section 39–2–117(6) provides that if the Board's decision is against the respondent, then upon the recommendation of the Board that it is a matter of statewide concern the respondent may petition the district court for review of the Board's decision.[5] Since the Administrator is a proper respondent in an administrative appeal before the Board, *cf. West–Brandt Foundation v. Carper,* 199 Colo. 334, 608 P.2d 339 (1980); 8 CCR 1301–1, Rules 6, 11, 19 (1988) (Board rules indicating that Administrator is proper respondent in Board hearings), the plain language of section 39–2–117(6) provides that the Administrator may seek judicial review of the Board's decision in appropriate circumstances.

Even if a resort to statutory construction principles is required to resolve any inconsistency between sections 39–2–117(6) and 24–4–106, the court of appeals erred in reasoning that giving effect to the plain language of section 39–2–117(6) would result in a repeal of portions of section 24–4–106 by implication. Section 24–4–106 is part of the State Administrative Procedure Act (APA), a general statute outlining, among other things, the availability of judicial review of any agency action. §§ 24–4–102(1), 24–4–102(3), 24–4–106. By contrast, section 39–2–117(6) is a narrow provision which addresses only the availability of judicial review of Board decisions reviewing the Administrator's determination on an exemption application. The interpretation of a special provision such as section 39–2–117(6) together with a general APA provi-

sion is controlled by section 24–4–107, 10A C.R.S. (1988), which provides that

[t]his article [4 of title 24, the APA] applies to every agency of the state having statewide territorial jurisdiction except [certain agencies not relevant here]. It applies to every other agency to which it is made to apply by specific statutory reference; *but, where there is a conflict between this article and a specific statutory provision relating to a specific agency, such specific statutory provision shall control as to such agency.*

(Emphasis added.) In this case, the court of appeals failed to consider the applicability of section 24–4–107, which establishes a clear rule of construction that requires the general provisions of section 24–4–106(4) to yield to the specific provisions of section 39–2–117(6).[6]

Applying the plain language of section 39–2–117(6), it is clear that the legislature intended to confer upon the Administrator the right to seek judicial review of adverse Board decisions under the circumstances specified in the statute.

2.

The court of appeals also concluded that the term "respondent" in section 39–2–117(6) did not include the Administrator because the Administrator is not listed in section 39–2–117(5)(b) as one of the parties who may appeal from a decision of the Administrator on an exemption application.[7] The court of appeals stated that

---

**5.** Young Life does not contest that the Board recommended in the present case that the issue presented was one of statewide concern.

**6.** The rule of construction contained in section 24–4–107 is consistent with the general statutory construction rule that when a special provision and a general provision conflict, "the special ... provision prevails as an exception to the general provision." § 2–4–205, 1B C.R.S. (1980); *see Fuhrer v. Department of Motor Vehicles,* 197 Colo. 325, 592 P.2d 402 (1979) (applying section 2–4–205 to provide an exception to a general provision and to reject a repeal by implication argument).

**7.** Section 39–2–117(5)(b) provides:
An appeal from any decision of the administrator may be taken by the board of county

commissioners of the county wherein such property is located, or by any owner of taxable property in such county, or by the owner of the property for which exemption is claimed if exemption has been denied or revoked in full or in part. Any such appeal shall be taken to the board of assessment appeals no later than thirty days following the decision of the administrator.

§ 39–2–117(5)(b), 16B C.R.S. (1988 Supp.).

This subsection was previously codified at section 39–2–117(5), 16B C.R.S. (1982), the citation employed in the court of appeals' opinion. However, the language has remained unchanged upon its recodification, with the exception that "administrator" appeared in the earlier codification as "property tax administrator."

"[s]ubparagraph (5)[ (b) ] refers to a right of appeal by the board of county commissioners, or by any owner of property, but nowhere does it refer to a right of appeal by the property tax administrator." 751 P.2d at 655.

The absence of a designation of the Administrator as a party who may appeal from her own decision cannot be interpreted as a legislative intent to preclude the Administrator from seeking review of an adverse Board decision. Since section 39–2–117(5)(b) pertains to appeals from the Administrator's decisions, there is simply no reason for the Administrator to appeal her own decisions to the Board. This fact alone explains why the Administrator is not listed in section 39–2–117(5)(b) as a party who may appeal to the Board. Additionally, section 39–2–117(6) provides that the "respondent" before the Board may petition the district court to review a Board decision against the respondent upon the recommendation of the board that it is a matter of statewide concern. Because the Administrator would be a necessary party in the adversary proceeding conducted before the Board, *cf. West–Brandt Foundation v. Carper*, 199 Colo. 334, 608 P.2d 339, it follows that the Administrator *is* one of the parties considered as a "respondent" within the meaning of section 39–2–117(6). The designation of the Administrator as a "respondent" in the instant case thus recognizes that the Administrator is a party to the Board proceeding and may seek judicial review of an adverse Board decision under section 39–2–117(6).

We conclude that section 39–2–117(6) evinces a legislative grant to the Administrator of a right to seek review of adverse Board decisions.[8] Because this legislative grant amounts to a statutory provision conferring upon the Administrator a right to seek judicial review of adverse Board decisions, our decision in *Martin* does not preclude the Administrator from having standing here.

### 3.

Although we conclude that *Martin* does not operate to foreclose appellate review here and that section 39–2–117(6) evinces a legislative grant to the Administrator of a right to seek review of adverse Board decisions, these conclusions are insufficient to establish affirmatively the Administrator's standing in the present case. The rule of *Martin* is a specialized one that operates to *preclude* standing in certain instances where we have concluded that absent contrary statutory authority, disputes between a subordinate and a superior state agency are properly to be resolved within the executive branch without resort to judicial review. However, in order to *establish* standing, a plaintiff must still demonstrate that she satisfies the requirements of the general standing analysis developed in *Wimberly v. Ettenberg*, 194 Colo. 163, 168, 570 P.2d 535, 539 (1977).

The *Wimberly* standing inquiry requires a court to determine "(1) whether the plaintiff was injured in fact, [and] (2) whether the injury was to a legally protected right." *Wimberly*, 194 Colo. at 168, 570 P.2d at 539; *accord, e.g., O'Bryant v. Public Utilities Commission*, 778 P.2d 648, 652–653 (Colo.1989). The first prong of the standing test is a constitutional requirement since the judicial power granted "by article VI of the Colorado Constitution may be exercised only if an actual controversy exists, as demonstrated by real injury." *Colorado General Assembly v. Lamm*, 700 P.2d 508, 516 (Colo.1985).[9] The second standing requirement, that the injury be to

---

**8.** Subsequent to the court of appeals' decision in *Young Life*, a different division of the court of appeals held that "the Administrator does have standing to appeal an adverse decision of the Board pursuant to § 39–2–117(6)." *Maurer v. Denver Urban Economic Development Corp.*, 781 P.2d 111 (Colo.App.1989), *petition for cert. filed*, No. 89SC356 (Colo. Jun. 30, 1989).

**9.** We have also attributed the constitutional basis for the injury-in-fact requirement to the separation of powers doctrine embodied in article III of the Colorado Constitution. *See Wimberly*, 194 Colo. at 167, 570 P.2d at 538 ("Courts cannot, under the pretense of an actual case, assume powers vested in either the executive or legislative branches of government."), *quoted in Conrad v. City and County of Denver*, 656 P.2d 662, 668 (Colo.1982) and *State Board for Com-*

a legally protected right, "reflects prudential considerations of judicial self-restraint." *Id.* These prudential considerations are "judicially self-imposed limits on the exercise of [a court's] jurisdiction." *Allen v. Wright*, 468 U.S. 737, 751, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984); *accord Lamm*, 700 P.2d at 516.

■ Because the standing test of *Wimberly* consists of both constitutional and judge-made prudential considerations, *see, e.g., Lamm*, 700 P.2d 508, 515–16, a legislative grant of the right to seek judicial review is not in itself dispositive of the standing inquiry. *See Warth v. Seldin*, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975) (so long as constitutional injury requirement is also satisfied, "Congress may grant an express right of action to persons who otherwise would be barred by prudential standing rules"); *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 209, 93 S.Ct. 364, 366, 34 L.Ed.2d 415 (1972) (Congress may grant standing as broadly as constitutional injury requirement per-

mits); *see also Middlesex County Sewerage Auth. v. National Sea Clammers Ass'n*, 453 U.S. 1, 16, 101 S.Ct. 2615, 2624, 69 L.Ed.2d 435 (1981) (citizen-suit provision of Federal Water Pollution Control Act was intended by Congress to allow suits by all persons demonstrating constitutional injury in fact under *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972)).[10] Accordingly, in order to determine whether the Administrator has standing to seek judicial review of the Board's decision for the 1984 property tax year, we must consider whether the standing requirements of *Wimberly* are satisfied in the present case.[11]

(a)

*Injury In Fact*

■ A plaintiff may satisfy the constitutional injury in fact requirement for standing by demonstrating that the action complained of has caused or has threatened to cause injury. *O'Bryant*, 778 P.2d at 653 (Colo.1989); *Lamm*, 700 P.2d at 516; *Community Tele–Communications, Inc. v.*

*munity Colleges v. Olson*, 687 P.2d 429, 434 (Colo.1984).

**10.** Although the federal-court doctrine of standing has a different constitutional basis and is not co-extensive with the *Wimberly* standing inquiry, *see, e.g., Cloverleaf Kennel Club v. Colorado Racing Comm'n*, 620 P.2d 1051, 1055–56 (Colo.1980), we have previously relied on the standing decisions of the United States Supreme Court for guidance in construing standing principles generally applicable under both the federal and Colorado law of standing. *See State Board for Community Colleges v. Olson*, 687 P.2d 429, 434 (Colo.1984) (citing *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975)); *Cloverleaf Kennel Club*, 620 P.2d at 1058 (citing *Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), *Warth v. Seldin*, 422 U.S. 490, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975), and *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 93 S.Ct. 364, 34 L.Ed.2d 415 (1972)). Hence, the federal cases cited in the text above provide persuasive authority on the interaction of legislative grants of standing with the constitutional injury requirement since this issue is one of general applicability.

**11.** The *Wimberly* standing analysis was initially developed in the context of determining a private litigant's standing to obtain a district court order. *See Wimberly*, 194 Colo. at 165, 570 P.2d

at 536–37. However, we have also applied this general analysis to evaluate a private litigant's standing to challenge an administrative agency decision, *Cloverleaf Kennel Club*, 620 P.2d at 1055–56, the state legislature's standing to seek review of the governor's decision to transfer funds from the executive departments for which the funds were appropriated to other executive departments, *Lamm*, 700 P.2d at 515–16, and a state administrative agency's standing to challenge the decision of another state administrative agency, *Personnel Board*, 722 P.2d at 1017. As these precedents demonstrate, we have applied the general standing analysis first developed in *Wimberly* to a broad range of factual contexts, including the fact situation present here where one state agency seeks judicial review of the decision of another state agency. Accordingly, despite the presence of a governmental agency instead of a private party as the plaintiff in the instant case, *Wimberly* provides the appropriate framework for determining whether the Administrator has established standing here. *See City of New York v. City Civil Service Commission*, 60 N.Y.2d 436, 470 N.Y.S.2d 113, 116–17, 458 N.E.2d 354, 357–58 (1983) (whether challenge is raised by private entity or "by a governmental officer or agency with policy-making authority and functional responsibility in the subject area sought to be reviewed, the factors to be applied in determining standing to seek review of an administrative decision are the same").

*Heather Corp.,* 677 P.2d 330, 335 (Colo. 1984); *CF & I Steel Corp. v. Colorado Air Pollution Control Comm'n,* 199 Colo. 270, 279, 610 P.2d 85, 92 (1980). In the complaint filed in the district court, the Administrator alleged that the Board's decision was contrary to law, arbitrary and capricious, unsupported by substantial evidence, and violative of the exemption standards of section 39-3-101(1)(e), 16B C.R.S. (1982). Before this court, the Administrator has asserted that she is the only party who can ensure the uniform statewide enforcement of the property tax laws.

■ Implicit in the Administrator's pleadings is the allegation that the Board's decision impinges on the Administrator's interest in properly executing her duties under sections 39-2-109 and 39-2-117, 16B C.R.S. (1982 & 1988 Supp.). Previously, we have held that allegations of harm to a governmental body's institutional interests through a usurpation of authority by another governmental entity are sufficient to constitute injury in fact. *Lamm,* 700 P.2d at 516. Additionally, other jurisdictions have determined that interference by a reviewing agency with the authority of another agency to carry out its enforcement and policymaking functions is sufficient to demonstrate an injury to the interests of the reviewed agency. *See, e.g., Bureau of Taxation v. Town of Washburn,* 490 A.2d 1182, 1185-86 (Me.1985) (bureau's duties to enforce all property tax laws and ensure uniform assessment are sufficient to demonstrate injury by adverse decision of reviewing board); *City of New York v. City Civil Service Comm'n,* 60 N.Y.2d 436, 470 N.Y.S.2d 113, 117, 458 N.E.2d 354, 358 (1983) (significant policy determination by reviewing commission which interferes with agency's policymaking authority is sufficient to show injury to agency); *Pennsylvania Game Comm'n v. Department of Envtl. Resources,* 555 A.2d 812, 815 (Pa. 1989) ("an agency has an implicit power to be a litigant in matters touching upon its concerns"). Considering these authorities and the averments in the Administrator's pleadings, we conclude that the Administrator has alleged a constitutionally suffi-

cient injury in fact. *See Lamm,* 700 P.2d at 516.

### (b)

### Legally Protected Right

■ Next, we must examine whether the Administrator has satisfied the prudential requirement of demonstrating injury to a legally protected right. In the instant case, the Administrator may satisfy the prudential standing considerations by demonstrating that the harm she allegedly suffered is protected by a statutory or constitutional provision (i.e., that an intent to protect the Administrator's interest in ensuring that property tax exemptions are enforced uniformly statewide is explicit or fairly inferable from the statutory provisions under which the Administrator and the Board act) or by demonstrating that the legislature expressly conferred on the Administrator the right to seek judicial review of a Board decision. *See Cloverleaf Kennel Club,* 620 P.2d at 1057 (discussing requirements to satisfy prudential standing concerns). As we concluded above, section 39-2-117(6) evinces a legislative grant to the Administrator of a right to seek judicial review of Board decisions under the circumstances present here. Therefore, this legislative grant in section 39-2-117(6) is sufficient to satisfy the prudential considerations of the *Wimberly* standing inquiry by demonstrating that the injury alleged was to a legally protected interest. *See Cloverleaf Kennel Club,* 620 P.2d at 1057.

### 4.

■ Based on the analysis set forth above, we conclude that our decision in *Martin* does not preclude the Administrator from having standing for the 1984 property tax year. Additionally, the Administrator has alleged an injury in fact to a legally protected interest for the 1984 property tax year, thus meeting the constitutional and prudential standing requirements of *Wimberly* and establishing the Administrator's standing to seek review of the Board's decision for the 1984 property tax year.

## B.

### *1976–1983 Property Tax Years*

The parties present the same arguments regarding the Administrator's standing for the 1976–1983 property tax years as were discussed above for the 1984 property tax year. Our conclusion that the Administrator had standing to seek judicial review for the 1984 property tax year turned on the legislative grant to the Administrator in section 39–2–117(6) of the right to seek judicial review of adverse board decisions. However, section 39–2–117(6) is inapplicable to the 1976 through 1983 property tax years. In the absence of the specific legislative grant found in section 39–2–117(6), we conclude that the Administrator had no right to seek judicial review of the Board's decision since such review was not provided for by the APA.

### 1.

 In the present case, absent any specific legislative provision for judicial review such as section 39–2–117(6), judicial review of the Board's decision is allowed to the extent provided in section 24–4–106 of the APA. *See* § 24–4–106(2). The provisions of the APA apply to judicial review of all final agency actions unless a specific statutory scheme evinces a legislative intent that all or part of the APA review provisions should not apply. *See* § 24–4–107; *Ross v. Fire and Police Pension Ass'n,* 713 P.2d 1304, 1309 (Colo.1986) (statutory scheme creating Fire and Police Pension Association evinces clear intent that association not be considered an agency of the state government; thus association is not subject to judicial review provisions of APA); *Mountain States Tel. & Tel. Co. v. Public Utilities Comm'n,* 182 Colo. 269, 283, 513 P.2d 721, 728 (1973) (provisions for judicial review contained in public utilities statutes demonstrate obvious legislative intent that public utilities laws provide exclusive procedure for reviewing orders and decisions of PUC); *see*

*also Gonzales v. Industrial Comm'n,* 740 P.2d 999, 1001 (Colo.1987) (applying judicial review provisions of Colorado Employment Security Act, § 8–74–107(6), to review of Industrial Commission order).

Prior to the enactment of section 39–2–117(6), nothing in the statutes pertaining to the Administrator's duties in evaluating property tax exemption applications indicated a legislative intent to provide for judicial review other than as specified in the APA. Thus, for the 1976 through 1983 property tax years, any right the Administrator has to seek review of a Board decision must be found in the judicial review provisions of the APA.

### 2.

 Section 24–4–106(4) of the APA provides in part that "any person adversely affected or aggrieved by any agency action may commence an action for judicial review in the district court." The APA defines "person" to include "an individual, partnership, corporation, association, county, and public or private organization of any character other than an agency." § 24–4–102(12). An "agency" is "any board, bureau, commission, department, institution, division, section, or officer of the state, except those in the legislative branch or judicial branch." § 24–4–102(3). The Administrator is clearly an agency as that term is defined in the APA. Because agencies are specifically excluded from the APA definition of "person," and because only a "person" is authorized to bring an action for judicial review of an agency decision under section 24–4–106(4), the Administrator has no authority under the APA to seek judicial review of the Board's decision. *See Personnel Board,* 722 P.2d at 1016; *Board of County Comm'rs v. Love,* 172 Colo. 121, 126, 470 P.2d 861, 863 (1970). Furthermore, because any right to review the Board's decision for the 1976 through 1983 tax years must be found in the APA,[12] the

---

12. Before the district court, the Administrator also contended that section 39–8–108(2), 16B C.R.S. (1988 Supp.), conferred upon her a right to seek review of the Board's decision. However, section 39–8–108(2) relates solely to appeals from Board decisions reviewing the decisions of county boards of equalization on valuations of property for assessment. Section 39–8–108(2) is inapplicable to appeals from Board decisions under section 39–2–117(5) regarding

Administrator is precluded from seeking judicial review of the Board's decision for those years.

### C.

In summary, we conclude that the Administrator has demonstrated an injury in fact to a legally protected interest for the 1984 property tax year. For that year, section 39–2–117(6) evinces a legislative intent to confer upon the Administrator the right to seek judicial review of an adverse Board decision as specified in the statute. Thus, the Administrator has standing to seek review of the Board's decision for 1984. For property tax years prior to the effective date of section 39–2–117(6), however, the Administrator is precluded by the APA review provisions from seeking judicial review of the Board's decision. Accordingly, we do not reach the merits of the Administrator's claims for the 1976 through 1983 property tax years, and we affirm the judgment of the court of appeals for those tax years. Because the Administrator has standing to obtain judicial review of the Board's decision for the 1984 property tax year, we examine next the merits of the Administrator's substantive claims as they apply for that year.

### III.

The Administrator argues that the Board erred in ordering a property tax exemption for the Young Life properties because the Board's findings are not supported by the evidence in the record and, in any event, do not establish that the properties were exempt under section 39–3–101(1)(e), 16B C.R.S. (1982), based on use for religious worship and reflection.[13] We disagree, and we conclude that the Board did not err in ordering the Administrator to award Young Life an exemption from 1984 prop-

erty taxation for its Chaffee County properties.

Young Life presented extensive testimony by its president and other officials and by the Bishop of the Colorado diocese of the Episcopal Church. The thrust of all this evidence was that the purpose of Young Life is to spread the Christian gospel among young persons, that the reason for Young Life's ownership of the properties in question is to advance that purpose, and that by engaging the attention of young persons in camping activities and then directing the youths' attention to the religious meaning to be gleaned from these experiences the entire camping experience becomes a form of religious worship. The Board made extensive findings giving credit to this evidence. These findings are fully supported by the evidence and are reproduced in the appendix to this opinion. Based upon these findings, the Board concluded that "Young Life's primary and principle [sic] use of the ... property is to spread the gospel of Jesus Christ," that the Young Life facilities constitute "a unit and are devoted to the purposes of the organization," and that therefore Young Life had established its right to an exemption based on use of the property for religious worship. The record fully supports these findings and conclusions.

### A.

The properties at issue here are the four main holdings of Young Life in Chaffee County, in addition to related parcels not contiguous to the main properties. Some of the pertinent evidence before the Board regarding the nature and use of each of these properties is summarized below.

#### 1.

*Frontier Ranch and Silver Cliff*

Frontier Ranch and Silver Cliff are two camps used primarily by Young Life for its

---

property tax exemption determinations. *See West–Brandt Found. v. Carper,* 199 Colo. 334, 337 n. 7, 608 P.2d 339, 341 n. 7 (1980).

**13.** Although not addressed by the district court or the court of appeals, we granted certiorari to consider the merits of the Administrator's substantive claims challenging the Board's decision.

These issues were fully briefed and argued before this court. Thus, in the interest of judicial economy we have elected to address the Administrator's substantive claims here rather than to remand the case for further consideration on the merits.

summer camping programs for youths aged 12 to 18. Young Life programs are also held at the camps during winter and spring school vacation periods, and on weekends. When not being used by Young Life programs, Frontier Ranch and Silver Cliff are made available for the use of church groups and other religious organizations. The camps are also occasionally made available for use by school, community, and other nonreligious groups. The historical use data contained in the records indicates that over 95% of the campers attending the Silver Cliff camp did so as part of a religious program, with almost 70% of the total campers attending Young Life sponsored programs. At Frontier Ranch, almost 75% of the total campers attended Young Life sponsored programs, and over 96% of the campers attended as part of either a Young Life program or some other religious program.

The two properties contain facilities typically found in developed forest camp areas. Frontier Ranch includes approximately 696 acres containing several structures related to operating the camp and housing and feeding the camp program participants. These improvements include staff houses, social halls, a dining hall and kitchen, meeting rooms, and administrative offices. Silver Cliff consists of approximately 97 acres including a dining hall, 22 cabins for campers and staff, and recreational facilities including a swimming pool, basketball court, and shuffleboard courts. Young Life's promotional literature describes the camps as "the ideal environment for deepening one's Christian commitment" (Silver Cliff brochure) and a place to "consider[ ] the friendship of Jesus Christ" (Frontier Ranch

brochure). Young Life avoids the use of crucifixes and other religious symbols in its meeting places, such as the Kachina building at Frontier, in order to promote the spirit of informality that it finds conducive to communication with young people about spiritual matters.

The programs at Frontier and Silver Cliff involve typical camping activities such as hiking, horseback riding and other outdoor pursuits. Consistent with Young Life's informal approach, Young Life leaders and camp counselors integrate into these activities discussions about religion and Young Life's purpose.[14] Another camp activity is the wrangler's breakfasts. These breakfasts involve an early-morning horseback ride for two hours. Once at their destination, the camp staff person prepares breakfast and conducts a worship service for the participants.

At formal nightly meetings, called round-ups, there are discussions about the basic tenets of Christianity and what it means to be committed to God. Counselors are available throughout the camping programs to assist campers with questions about particular spiritual issues. Optional seminar meetings are also held discussing current cultural problems and the Christian faith. Camp counselors and other resident staff have daily morning and evening meetings for Bible study and prayer, and all camp meals are preceded by grace and an expression of thanks to the Lord.

## 2.
### Trail West Lodge

A Young Life promotional brochure describes the Trail West Lodge as "Colora-

---

**14.** Typical of the extensive evidence concerning the integration of recreational activities and religious worship in Young Life's camping programs and other activities at Frontier, Silver Creek, and at Trail West as well, is the following testimony of Rev. Robert Mitchell, the president of Young Life:

Q. Does Young Life have any purpose in operating these camps other than to spread the message of Christ to kids?
A. We have no other purpose for existence as a mission. And camping being part of it, there is no other purpose than to translate, interpret, express the beauty and majesty of

God as revealed in Christ to young people. That is our total, total purpose and reason for existence.
Q. Do you feel that the recreational activities such as skiing or horseback riding or rafting detract in any way from that purpose?
A. No, to the contrary. To us, skiing, horseback riding, swimming, opportunities to be with young people in a setting and in an activity that is wholesome is all a part of the expression of God in worship. There is no ["]we are now doing something secular, we are now doing something spiritual.["] That does not enter our minds.

do's Premier Christian Family Lodge," which offers "a warm Christian atmosphere." The Trail West property comprises approximately 62 acres, 42 acres in the main area and 20 acres in the Mercury No. 1 and No. 2 mining claims located about one mile west of the main property. At the hearing before the Board, Rev. Robert Mitchell, the executive director and president of Young Life, testified that Trail West is considered to be a major Christian retreat center. A wide range of religious retreat programs occur at Trail West including conferences for church and religious leaders, programs similar to the camp programs conducted at Frontier and Silver Cliff, and biblical training sessions for Young Life staff. Trail West is also used by non-Young Life religious groups for retreat programs similar to those run by Young Life.[15] Additionally, Young Life staff regularly attend and participate in the non-Young Life retreat programs.

The record contains a copy of the daily schedule for the St. Louis Young Life chapter's 1984 summer retreat program at Trail West Lodge. George Chisman, a Young Life employee at Trail West, testified that this schedule was typical of the Young Life programs conducted at Trail West. This schedule reflects that the week's activities included a Sunday worship service, morning bible study sessions on Monday through Friday, and three evening fellowship and "club" meetings where Young Life's religious message is delivered. Other activities included hikes, river rafting, and a lunch cookout.

The historical use data for Trail West Lodge shows that over 93% of the campers using Trail West did so as part of a religious program, although only 30% of the campers participated in Young Life programs. Trail West Lodge historically had a hotel season during which any paying person or group could stay at the lodge. That use was discontinued prior to the 1984 property tax year at issue here, although a member of the public could obtain accommodations if this would not intrude upon activities of religious groups making use of the property at the time. Additionally, school, community, and government agency groups sometimes use the Trail West facilities for meetings, meals, and receptions. The historical use data and group attendance lists in the record indicate that this use amounts to only about 6% of the total "campers" using Trail West Lodge.

The exemption application for Trail West also includes two mining claims separate from the main lodge area. The field inspector for the Administrator, Susan Whitfield, testified regarding her visit to the mining claims. She stated that the claims were located on the side of a hill and were reached by driving up a very steep, rocky trail. She observed the remains of old buildings at the site, but did not see any signs of recent use such as horse manure that might indicate horseback riding to the two claims. However, P. Michael Sheridan, Young Life's director of properties, testified that the mining claims are used as destinations for hiking and horseback riding. He further stated that the activities engaged in at the mining claims include picnicking, meditation, prayer and reflection.

### 3.
### Rancho Caballo

Rancho Caballo consists of approximately 355 acres used to maintain Young Life's horses for use in the programs at the other three Young Life properties in Chaffee County. Improvements on Rancho Caballo include a barn, shed and corrals. According to the field inspector's report contained in the record, about 15 horses are grazed at Rancho Caballo, and the land is also used to grow hay to feed the Young Life stock, which includes a total of 70 horses. Young Life's property director, P. Michael Sheridan, testified that Rancho Caballo is an important part of Young Life's programs and the use of its other properties since it allows Young Life to control the quality and safety characteristics of its riding

---

**15.** Examples of specialized non-Young Life retreat programs cited by Rev. Williams in his testimony included divorce recovery workshops and marriage enrichment weekends. The overall purpose of these retreat programs is "to help people in their own relationship with God."

stock. As Sheridan stated when asked why Young Life did not lease saddle stock, "If we lease, we have no control over what kind of animals we get. When we put kids on them, we want to know exactly what kind of horses we have." The Administrator's field examiner testified that on her visit to Rancho Caballo she did not observe any buildings set aside for religious reflection.

### B.

The exemption from taxation of property used for purposes of religious worship and reflection has its roots in article 10, section 5, of the Colorado Constitution, which provides:

> Property, real and personal, that is used solely and exclusively for religious worship, for schools or for strictly charitable purposes ... shall be exempt from taxation, unless otherwise provided by general law.

The legislature has addressed this issue by providing that among the property exempt from general taxation shall be

> [p]roperty, real and personal, that is owned and used solely and exclusively for religious worship and not for private or corporate profit. The exemption contemplated in this paragraph (e) shall be limited to any building or edifice and the personal property located therein which is primarily used for religious worship, and any land which is essential to the functioning of said edifices, or to meet zoning standards and building requirements, or provide parking for such building or edifice, together with ... houses used primarily for religious reflection by lay men and women of all denominations, commonly known as retreat houses.

§ 39–3–101(1)(e), 16B C.R.S. (1982).

In the present case, the Board found, among other things, that

> the subject property is used to present the gospel in both formal and informal settings, and that this presentation of the

gospel is religious worship. The presentation of the gospel in a more formal setting would include, for example, the evening sessions held at the end of each day at camp (which are much like Sunday school services), the opportunity each week for the campers to come forward and make a statement of their faith, evening and Sunday devotional services held at Trail West Lodge, prayer and Bible study sessions for work crew members, counselors, and staff, the use of various rooms at Trail West as confessionals, and baptisms in the pools.

. . . . .

> The Board further finds that Frontier Ranch, Silver Cliff Ranch, and Trail West Lodge are houses primarily used for religious reflection by laymen and women of all denominations commonly known as retreat houses.[16]

The Administrator challenges the Board's findings as unsupported by the record. Specifically, the Administrator claims that the Board should have relied on the testimony and other evidence presented by the Administrator's field inspector. that none of the areas or buildings on the Young Life properties were used primarily for religious worship or reflection.

■ In determining whether property is entitled to exemption from taxes "[e]ach case must be decided on the specific facts presented." *West Brandt Found., Inc. v. Carper*, 652 P.2d 564, 571 (Colo.1982). A reviewing court may not set aside a decision by the Board of Assessment Appeals unless it is unsupported by competent evidence. *Board of Assessment Appeals v. Colorado Arlberg Club*, 762 P.2d 146, 151 (Colo.1988); *see* § 24–4–106(7), 10 C.R.S. (1982) (court shall set aside agency action if, among other grounds, it is "based upon findings of fact that are clearly erroneous on the whole record, [or] unsupported by substantial evidence when the record is considered as a whole"). The Board, and

---

**16.** As mentioned earlier, the Board's "Findings," not including its summary of the testimony or its "Conclusions," are set forth in full in the appendix to this opinion. For convenience, we describe these findings as findings that the property is primarily used for religious worship and reflection.

not a reviewing court, has the responsibility of weighing the evidence and resolving any conflicts. *Colorado Arlberg Club,* 762 P.2d at 151; *Charnes v. Lobato,* 743 P.2d 27, 32 (Colo.1987) ("[w]here conflicting testimony is presented in an administrative hearing, the credibility of witnesses and the weight to be given their testimony are decisions within the province of the agency"). Thus, we may not reverse a decision of the Board that is supported by competent evidence, even if the record reveals the presence of evidence contrary to the Board's findings. Although the record in the present case does contain some evidence contrary to the Board's findings, we determine that the Board's findings are adequately supported by the competent evidence in the record.

### 1.

The thrust of the Administrator's argument is that the activities carried on by Young Life and other users of Young Life's Chaffee County properties are uses typical of mountain camps and resorts, and thus the evidence is insufficient to show that the properties were primarily used for religious worship or religious reflection so as to qualify for exemption under section 39–3–101(1)(e).[17] In its findings, the Board specifically acknowledged that "not all of the activities that take place at Young Life camps or at Trail West are inherently religious, [however] they are used by Young Life as effective vehicles for presenting the gospel during the course of the day and for building relationships so that the campers will be more receptive to the gospel as it is presented during the course of Young Life's program."

In determining whether the Young Life properties qualified for an exemption based on use for religious worship and reflection, the Board must examine the use to which the property is put, not the character of the owner. *See West Brandt Found., Inc. v. Carper,* 652 P.2d 564, 567 (Colo.1982); *United Presbyterian Ass'n v. Board of County Comm'rs,* 167 Colo. 485, 448 P.2d 967 (1968). However, "the character of the owner may often illuminate the purposes for which the property is used and need not be excluded from consideration." *West Brandt,* 652 P.2d at 567–68. *Accord Kemp v. Pillar of Fire,* 94 Colo. 41, 42, 27 P.2d 1036, 1036 (1933). In this instance, the Board permissibly considered the character of the property owner in concluding that the Young Life properties are used for religious worship and reflection. Thus, although not all the activities conducted on the Young Life properties are inherently religious in nature, by considering the character of the owner and the competent evidence in the record that the uses of the properties were to advance in an informal and often indirect manner Young Life's purposes, including promotion of an evangelistic Christian testimony among adolescents, the Board could and did conclude that any nonreligious aspects of these activities were necessarily incidental to the religious worship and reflection purposes for which Young Life claimed the properties were used. *Cf. General Conference v. Carper,* 192 Colo. 178, 182, 557 P.2d 832, 834 (Colo.1976) (Colorado decisions have extended exemptions to property incidental to furtherance of exempt uses; because publication of religious literature can be an aspect of religious worship, property used for publication purposes could be exempt based on use incidental to religious worship); *Horton v. Fountain Valley School,* 98 Colo. 480, 485, 56 P.2d 933, 936 (1936) (land necessary for school purposes included 1400 acres used by students for horseback riding; parcel was thus exempt from property taxation); *Kemp v. Pillar of Fire,* 94 Colo. 41, 27 P.2d 1036 (1933) (land reasonably necessary for private college purposes included 200 acres used to grow

---

17. The Administrator also argues that the Board erred in concluding that Young Life was entitled to a property tax exemption based on use for charitable purposes. § 39–3–101(1)(g)(I), 16B C.R.S. (1982). Young Life's initial application for an exemption sought an exemption based upon both charitable use and use for religious worship. However, the Board's order clearly provides that the exemption was granted only on the basis of the use of the properties for religious worship and reflection. Accordingly, we need not consider the Administrator's arguments that Young Life was not entitled to a charitable use exemption.

produce for student consumption, to grow feed for livestock and chickens used by college, and for sale to benefit college; parcel was thus exempt from property taxation).

Competent evidence in the record supports the Board's conclusion that the character of the owner indicates that any nonreligious aspects of the outdoor activities sponsored by Young Life are necessarily incidental to Young Life's use of its properties for religious worship and reflection.[18] For instance, Rev. Mitchell, Young Life's president, testified that Young Life's programs have "no segmentation where we are now doing something Christian, now something secular.... [T]here is a wholeness of the expression of the Christian faith." Other evidence in the record supports the Board's findings that Young Life's use of the properties for religious worship and reflection is integrated into the daily activities conducted on the properties. For example, wrangler breakfasts include a worship service, counselors are available to discuss spiritual issues with campers at any time, mountain hikes may include religious discussions, and at the nightly roundup meetings the group explores the meaning of each day's experiences in relation to living a Christian life.

William Frey, Bishop of the Episcopal Diocese of Colorado, testified that Young Life's programs "wove the concept of total-life experience together with the practice of the Christian faith." Bishop Frey also testified that "it is easier for young people to have what I might call an initial experience—religious experience—in the less formal setting out-of-doors." [19] This and other similar evidence in the record, when considered in light of Young Life's character, as stated in its articles of incorporation, as an organization dedicated to promoting an evangelistic Christian testimony and to encouraging the development of a Christian spiritual life among young people, is sufficient to support the Board's conclusion that Young Life's properties were primarily used for religious worship and reflection.

**2.**

The Board's findings and conclusions are consistent with our precedents providing a policy of receptiveness towards "exemptions implementing the constitutional policy of support for charitable and religious endeavors." *General Conference*, 192 Colo. at 182, 557 P.2d at 834; *accord Kemp*, 94 Colo. at 44–45, 27 P.2d at 1037.[20] Other

---

**18.** This evidence also supports the Board's conclusion that the property tax exemption extended to Rancho Caballo, the two Mercury mining claims, and the outlying parcel associated with Frontier Ranch. Although, as the Administrator's field inspector testified, there were no structures on these properties designated for use for religious worship or reflection, other evidence in the record indicates that these properties were necessarily incidental to Young Life's use of its main properties at Frontier, Silver Cliff and Trail West for religious worship and reflection. For instance, testimony proffered by Young Life indicated that the mining claims and the Frontier outlying parcel were used as destinations for horseback rides and as locations for prayer, worship, and meditation. The testimony also indicated that Rancho Caballo was an integral part of maintaining Young Life's own saddle stock. Because, as the Board found, Young Life's use of outdoor activities was an effective and important component of its program of religious worship and reflection, property necessary to support these activities and Young Life's religious use is also entitled to exemption. *See General Conference v. Carper*, 192 Colo. 178, 557 P.2d 832 (Colo.1976); *Horton*

*v. Fountain Valley School*, 98 Colo. 480, 56 P.2d 933 (1936); *Kemp v. Pillar of Fire*, 94 Colo. 41, 27 P.2d 1036 (1933); *see also Order Minor Conventuals v. Lee*, 64 A.D.2d 227, 409 N.Y.S.2d 667, 669 (1978) (affirming grant of property tax exemption to underdeveloped land owned by religious organization and used for "prayer and solitude free from the external pressure and duress of contemporary living"); *Kerrville Indep. School Dist. v. Southwest Texas Encampment Assoc.*, 673 S.W.2d 256, 260 (Tex.App.1984) (religious camp's housing and recreational facilities were reasonably necessary to use of 64–acre camp for religious worship; it is "reasonable to assume that [campers] could not engage in effective worship during their entire stay").

**19.** Bishop Frey further noted that an important aspect of Young Life's camps and lodge is that they are "place[s] set aside for the primary purpose of Christian gatherings, Christian worship, [and] Christian fellowship."

**20.** This policy represents an exception to the general rule that the presumption is against tax exemption and the burden is on the one claiming exemption to establish clearly the right to

jurisdictions have also held that property tax exemptions for religious uses should not be narrowly construed. *See, e.g., Order Minor Conventuals v. Lee*, 64 A.D.2d 227, 409 N.Y.S.2d 667, 668 (1978) ("While a statute creating a tax exemption should be strictly construed against those seeking the benefit of the exemption, the interpretation should not be so narrow and literal that it defeats the exemption's settled purpose."); *City of Nome v. Catholic Bishop*, 707 P.2d 870, 880 (Alaska 1985); *Peninsula Covenant Church v. County of San Mateo*, 94 Cal.App.3d 382, 156 Cal.Rptr. 431, 436 (1979) (rule of strict construction for tax exemption statutes "does not mean that the narrowest possible interpretation be given"); *Bishop of the Roman Catholic Diocese v. Kinney*, 2 Ohio St.3d 52, 442 N.E.2d 764 (1982) (declining to give a narrow construction to religious worship property tax exemption since such a literal construction could prevent any exemption being given).[21]

The Administrator contends that the Board's decision is inconsistent with our decision in *Young Life v. Division of Employment and Training*, 650 P.2d 515 (Colo.1982). In that case, we affirmed the Division of Employment's decision that Young Life was not a "church" for purposes of section 8–70–103(10)(g)(I), 3B C.R.S. (1986), and therefore was not eligi-

ble for an exemption from Colorado's unemployment tax. In addition to claiming that the Division's definition of "church" violated the establishment clause of the first amendment to the federal constitution and impermissibly burdened Young Life's religious practices under the free exercise clause, Young Life also argued that the Division's definition violated the Colorado Constitution's prohibition against discrimination among religions, Colo. Const. art. II, § 4.[22] In rejecting Young Life's state constitutional argument, we stated that

> the Division's decision does not violate the Article II, Section 4 proscription against "preference" for "any religious denomination or mode of worship." *Young Life is neither a denomination nor a mode of worship as those terms are used in the state constitution.*

650 P.2d at 526 (emphasis added).

In the present case, the Administrator relies on the language highlighted above to argue that the Board could not determine that Young Life's programs at its Chaffee County properties amounted to religious worship and reflection. However, our decision in *Division of Employment* held only that Young Life, as an organization, did not constitute a separate religious denomination or mode of worship for purposes of the state constitutional proscription of reli-

---

such relief. *United Presbyterian Ass'n v. Board of County Comm'rs*, 167 Colo. 485, 496, 448 P.2d 967, 972 (1968).

**21.** Avoiding a narrow construction of property tax exemptions based upon religious use also serves the important purpose of avoiding any detailed governmental inquiry into or resultant endorsement of religion that would be prohibited by the establishment clause of the first amendment to the United States Constitution. *See Hernandez v. Commissioner*, — U.S. —, 109 S.Ct. 2136, 2146, 104 L.Ed.2d 766 (1989) (in income tax exemption context, pervasive governmental inquiry into "the subtle or overt presence of religious matter" is proscribed by the first amendment establishment clause); *Holy Spirit Ass'n v. Tax Comm'n*, 55 N.Y.2d 512, 450 N.Y.S.2d 292, 295, 298, 435 N.E.2d 662, 665, 668 (1982) (in determining eligibility for property tax exemption, first amendment prohibits courts from inquiring into validity of religious beliefs); *see also Texas Monthly, Inc. v. Bullock*, — U.S. —, 109 S.Ct. 890, 103 L.Ed.2d 1 (1989) (plurality opinion) ("The prospect of inconsistent treat-

ment and government embroilment in controversies over religious doctrine seems especially baleful where ... a statute requires that public officials determine whether some message or activity is consistent with 'the teaching of the faith.'"); *United States v. Lee*, 455 U.S. 252, 263 n. 2, 102 S.Ct. 1051, 1058 n. 2, 71 L.Ed.2d 127 (1982) (Stevens, J., concurring) ("The risk that governmental approval of some [claims for religious tax exemptions] and disapproval of others will be perceived as favoring one religion over another is an important risk the Establishment Clause was designed to preclude."). *But see Young Life v. Division of Employment and Training*, 650 P.2d 515, 523–24 (Colo.1982) (simply determining applicability of statutory exemption to a particular group does not constitute excessive governmental entanglement with religion).

**22.** Art. II, § 4, of the Colorado Constitution provides in pertinent part:

> Nor shall any preference be given by law to any religious denomination or mode of worship.

gious discrimination. Nothing in our decision suggested that the individual participants in Young Life programs were not involved in religious worship or reflection; indeed, we acknowledged that "the religious beliefs of Young Life's participants are consistent with traditional Protestant Christian doctrine and many of the group leaders involved in Young Life meetings are ministers ordained by orthodox Protestant sects." 650 P.2d at 526. Because our decision in *Division of Employment* did not address whether Young Life's properties were used for religious worship and reflection, and because the unemployment tax exemption at issue there turned on the interpretation of a term from a statute not under consideration here, we conclude that *Division of Employment* is not controlling of the instant case.[23]

Our decision in *West Brandt Foundation, Inc. v. Carper,* 652 P.2d 564 (Colo. 1982), also is not dispositive of the present case. In *West Brandt,* we considered whether the Singin' River Ranch owned by the West Brandt Foundation was entitled to a property tax exemption based on its use for charitable purposes. The Ranch was a group guest facility comprising 260 acres including two dormitories, a dining hall, and recreational facilities. 652 P.2d at 566. The Ranch was made available to church and school groups and used for a summer program called the Christian Life Adventure Camp. According to West Brandt's president, the purpose of making the Ranch facilities available to church and school groups was "to get more people to live the Christian life." *Id.* We concluded that the Ranch was not entitled to a property tax exemption since West Brandt "did not adduce sufficient evidence of charitable use to meet the standards imposed by case law." *Id.* at 569.

However, *West Brandt* is distinguishable from the instant case. *West Brandt* construed the charitable use exemption; the West Brandt Foundation did not claim that the property was used for religious worship. *See* 652 P.2d at 569. Furthermore, we stated in *West Brandt* that our decision did not categorically "exclude from exemption camping and retreat facilities of this kind.... Each case must be decided on the specific facts presented." *Id.* at 570–71. In *West Brandt,* the specific facts were that groups using the Ranch provided their own instructors and materials, and that student ski groups were among the groups that accounted for the Ranch's largest receipts for lodging. *Id.* at 566. By contrast, the facts in this case, as established by the Board's findings, were that Young Life instructors and counselors engaged program participants in religious worship through their daily activities, and that the lodging facilities at the Young Life properties were primarily used for lodging associated with religious programs conducted on Young Life's properties. These factual differences, together with the dis-

---

**23.** The Administrator further contends that the Board's findings are inconsistent with our decision in *Young Life Campaign v. Board of County Comm'rs,* 134 Colo. 15, 300 P.2d 535 (1956), where we also considered whether the Frontier Ranch and Silver Cliff properties were entitled to a property tax exemption. We interpreted the Colorado Constitution and property tax statutes to allow exemptions for religious, charitable, and educational nonprofit corporations only when the property was operated for the benefit of the people of this state or when the corporation was created by the state or controlled by it. 134 Colo. at 31–32, 300 P.2d at 544. Because Young Life was a foreign corporation not primarily serving the people of Colorado, we held that Young Life was not exempt from the payment of Colorado property taxes. *Id.* at 32–33, 300 P.2d at 544.

However, in *General Conference of the Church of God v. Carper,* 192 Colo. 178, 557 P.2d 832 (1976), we explicitly overruled our holding in *Young Life Campaign* that a religious organization must establish a benefit to the people of Colorado in order to be eligible for a property tax exemption. *Id.* at 180, 557 P.2d at 833. Although the Colorado benefit test may still have some applicability to exemptions based on charitable use, *West Brandt,* 652 P.2d at 569, the exemption in the present case was granted only on the basis of religious use of the property. *See supra* note 14. Accordingly, because our decision in *Young Life Campaign* was overruled with regard to religious property tax exemptions in *Church of God,* and because the exemption granted here was not predicated on the use of the property for charitable purposes, we conclude that *Young Life Campaign* is not applicable to the property tax exemption issue presented here.

tinctions between the religious use exemption at issue here and the charitable use exemption at issue in *West Brandt,* amply establish that the decision in *West Brandt* is not controlling of the instant case.

### C.

Based on the record evidence, and authorities discussed above, we conclude that the Board did not err in ordering the Administrator to award Young Life an exemption from 1984 property taxation for its Chaffee County properties. The Board's decision is supported by competent evidence in the record demonstrating that the properties are primarily used for religious worship and reflection or for purposes necessarily incidental to the exempted primary uses. *See General Conference v. Carper,* 192 Colo. at 182, 557 P.2d at 834 (exemptions may be extended to property incidental to furtherance of exempt uses). Because the Board's decision is supported by competent evidence in the record, we may not set it aside even though the record also contains conflicting evidence. *See Colorado Arlberg Club,* 762 P.2d at 151. Accordingly, we reject the substantive claims raised by the Administrator for the 1984 property tax year and we affirm the Board's decision ordering the Administrator to grant an exemption for Young Life's properties for that year.

### IV.

In summary, we hold that for the 1984 property tax year the Administrator has standing to appeal to the district court the Board's decision ordering the Administrator to grant a property tax exemption to Young Life. For the 1976 through 1983 property tax years, however, the Administrator is precluded from obtaining review of the Board's decision by section 24-4-106(4) of the APA. Accordingly, we reverse the judgment of the court of appeals that the Administrator lacked standing to appeal for the 1984 property tax year, and we affirm on the merits the Board's decision ordering the Administrator to grant a property tax exemption to Young Life for that year. Because the Administrator had no right to appeal the Board's decisions for the 1976 through 1983 property tax years, we affirm the judgment of the court of appeals dismissing the Administrator's complaint as to those years and we thus do not review the Board's decision as to those years.

MULLARKEY, J., concurs in part and dissents in part.

ROVIRA and VOLLACK, JJ., join in the concurrence and dissent.

### APPENDIX

FINDINGS OF THE BOARD OF ASSESSMENT APPEALS:

The evidence clearly establishes that Young Life is a bona fide religious organization whose purpose, as set forth in its Articles of Incorporation, is to spread the Christian gospel. The Board finds that the primary use of the subject property is to further the religious purposes of Young Life. The Board finds that Young Life has no purpose in owning and operating the subject property other than to promote Christian gospel, and that this is the primary use of the subject property.

[Young Life's] uncontroverted exhibits and testimony show that the primary users of the subject property are Young Life and other religious groups, and that the nonreligious use of the property is clearly incidental.

The Board finds that the subject property is used to present the gospel in both formal and informal settings, and that this presentation of the gospel is religious worship. The presentation of the gospel in a more formal setting would include, for example, the evening sessions held at the end of each day at camp (which are much like Sunday school services), the opportunity each week for the campers to come forward and make a statement of their faith, evening and Sunday devotional services held at Trail West Lodge, prayer and Bible study sessions for work crew members, counselors, and staff, the use of various rooms at Trail West as confessionals, and baptisms in the pools.

The Board finds that, based on the weight of the evidence, more formal presentation of the gospel takes place at the subject property during any given week than takes place in some churches. Perhaps more important to Young Life's religious purposes is the informal presentation of the gospel, which takes place between campers and counselors and at Trail West during the course of the various activities throughout the day. While not all of the activities that take place at Young Life camps or at Trail West are inherently religious (for example, horseback riding in the summer and skiing in the winter), they are used by Young Life as effective vehicles for presenting the gospel during the course of the day and for building relationships so that the campers will be more receptive to the gospel as it is presented during the course of Young Life's program. The activities that Young Life and the other religious organizations using these properties use as vehicles to promote the gospel are not only legitimate means to Young Life's end, but according to the unrefuted testimony, they are the most effective ways of presenting the gospel to young people.

This Board finds that the purpose of virtually all of the activities that take place at the subject property are religious worship, and if Young Life would be required to move toward a more formalized presentation of the gospel in its programs in order to obtain exemption, the programs could ultimately become less effective.

Consistent with this conclusion, the Board does not find it significant that the various places on the subject property where the presentation of the gospel takes place are not designated by crosses, stained glass, and other religious insignias. The Board finds that worship, in both the formal and informal context, takes place at any number of different locations on the subject property, and that the entire property is used in conjunction with and to further the religious purposes set forth in Young Life's Articles of Incorporation.

The Board further finds that Frontier Ranch, Silver Cliff Ranch, and Trail West Lodge are houses primarily used for religious reflection by laymen and women of all denominations commonly known as retreat houses.

The Board finds that Young Life does not operate for private gain or corporate profit, and that when the weight of the evidence and testimony is considered, including testimony of volunteer labor, scholarships, and comparable rates, a significant gift has been provided.

MULLARKEY, Justice, concurring in part and dissenting in part:

Although my analysis is different, I agree with the majority that the Property Tax Administrator (Administrator) could not appeal a decision of the Board of Assessment Appeals (Board) until the right to seek judicial review was statutorily conferred upon her by the enactment of section 39–2–117(6), 16B C.R.S. (1988 Supp.), effective beginning in the 1984 tax year. This new section was part of H.B. 1583 entitled "Concerning Tax Appeals" which added several new statutory sections and amended others in order to permit the Administrator to seek judicial review of decisions by the Board of Assessment Appeals and the Board of Equalization. *See* Ch. 520, secs. 1–7, 1983 Colo. Sess. Laws 2086–88. My analysis of the standing question is set forth in part I below. In part II, I respectfully dissent from the majority's conclusion that Young Life is entitled to a tax exemption for the 1984 tax year.

### I.

A court need not inquire into the issue of an agency's standing when, as in this case, a statute authorizes an administrative agency to bring an appeal. *See* 4 K. Davis, *Administrative Law Treatise* § 24:5 (1983) (once Congress has conferred standing, no need to inquire into constitutional limits on standing); B. Schwartz, *Administrative Law*, 2d ed. § 8.12 (1984) (despite constitutional implications of standing requirement, legislature can provide for standing where none would otherwise exist); F. Davis, *Standing of a Public Official to Challenge Agency Decisions: A Unique Problem of State Administrative Law*, 16 Ad.

L.Rev. 163, 175 (1964) ("the legislature can either expand or restrict the classes or types of persons with standing to challenge administrative decisions").

Administrative agencies are creatures of statute and have such powers and duties as the legislature gives them. *See, e.g.,* B. Schwartz, *Administrative Law* 10 (1984). The line of Colorado cases cited by the majority which includes *Nadeau v. Merit System Council,* 36 Colo.App. 362, 545 P.2d 1061 (1975) and *Martin v. District Court,* 191 Colo. 107, 550 P.2d 864 (1976), is premised on this understanding of the legislature's ability to define the relationships between subordinate state entities. The legislature can create a hierarchy between agencies and provide that one agency's decision is final and unappealable by another agency. In the absence of legislation authorizing an agency to appeal, the general rule is that an agency cannot seek judicial review. Annot. 117 A.L.R. 216 (1938); F. Davis, 16 Ad.L.Rev. at 178.

Conversely, the legislature may decide that an agency decision is not final or binding on another agency. It may authorize the litigating agency to appeal the decision of the adjudicating agency by means of a judicial review action. For example, after we held that a county could not seek judicial review of an adverse decision by a state agency, *see, e.g., Board of County Commissioners v. State Board of Social Services,* 186 Colo. 435, 528 P.2d 244 (1974) (county did not have standing to challenge rule promulgated by state board of social services), the legislature amended the Administrative Procedure Act to allow counties to appeal. *See* §§ 24-4-102(12) & 24-4-106(4.5), 10A C.R.S. (1988); Ch. 213, secs. 1 & 2, §§ 24-4-102(12) & 24-4-106(4.5), 1979 Colo.Sess.Laws 843.

In my view, then, the sole question which a court needs to ask in determining whether one governmental agency can appeal from the decision of another agency is whether the legislature has authorized the litigating agency to appeal. I would hold that the existence of such a statute is dispositive.

The majority, however, does not find the existence of statutory authority for the agency to seek judicial review to be dispositive. Instead, it applies the standing test of *Wimberly v. Ettenberg,* 194 Colo. 163, 570 P.2d 535 (1977). I do not find that analysis persuasive and I note that many of the cases discussed by the majority did not involve judicial review actions brought by administrative agencies. For example, *Cloverleaf Kennel Club v. Colorado Racing Commission,* 620 P.2d 1051 (Colo. 1980), concerned the ability of a kennel club and others to challenge the allocation of additional dog racing days to a competing kennel club.

As applied to an administrative agency seeking judicial review, it is difficult to imagine how the *Wimberly* test of injury in fact to a legally protected interest will be satisfied in the absence of a statute authorizing the agency to seek judicial review. It seems similarly unlikely that the *Wimberly* test will not be met if a statute expressly authorizes an agency to bring a judicial review action. Indeed, when the majority applies its standing test to the 1976–1983 property tax years, it concludes quite simply that "the Administrator had no right to seek judicial review of the Board's decision since such review was not provided for by the APA." Maj. op. at 1326. Thus, I question whether the test adopted by the majority will cause any different result from the test which I have proposed.

In only one case cited by the majority has this court found that a governmental entity had standing in the absence of a statute authorizing suit. That case was *Colorado General Assembly v. Lamm,* 700 P.2d 508 (Colo.1985), which is readily distinguishable from the case now before us. The *General Assembly* case did not involve the ability of an administrative agency to seek judicial review but rather concerned the unprecedented issue of the ability of one of the three coordinate branches of government, the General Assembly, to sue another branch, the executive, in state district court. The Governor argued that the General Assembly could not use a joint resolution to authorize itself to file suit in district court but that it could proceed only

by means of a bill which must be submitted to him for his approval prior to enactment. 700 P.2d at 515. This court rejected the Governor's argument and decided that the legislature had standing to sue the Governor under the *Wimberly* test because it alleged an injury in fact to a legally protected right. *Id.* at 516. An administrative agency's request for judicial review of the decision made by another administrative agency implicates none of the difficult constitutional issues which made it appropriate for this court to apply the *Wimberly* test of standing in the *General Assembly* case.

The majority's analysis necessarily implies that there will be cases in which an administrative agency can bring a judicial review action without any legislative authorization and that there will be other cases in which an agency will be prevented from pursuing judicial review even if it is authorized by statute to seek such review. I do not agree with this approach and I believe that it will lead to unsound results.

In the case now before us, however, I am satisfied that the legislature authorized the Administrator to appeal a decision of the Board as of the 1984 tax year. I find no such authority for the Administrator prior to 1984. Hence, under a different analysis from that undertaken by the majority, I concur in the decision that the Administrator has standing to challenge the Board's decision to grant Young Life a tax exemption for the 1984 tax year.

## II.

I dissent from Part III of the majority opinion in which the majority concludes that Young Life is entitled to a tax exemption for its four parcels of property in Chaffee County under the "religious worship" exemption of section 39–3–101(1)(e), 16B C.R.S. (1982). For the reasons set forth below, I would hold that under the facts of this case, Young Life's use of the property does not meet the constitutional and statutory standard of being used "solely and exclusively for religious worship." Colo. Const. art. X, § 5; § 39–3–101(1)(e).

### A.

The statute at issue in this case is the "religious worship" provision, § 39–3–101(1)(e), 16B C.R.S. (1982), which provides an exemption from property tax for property "that is owned and used solely for religious worship."[1] The statute defines property which is "used solely and exclusively for religious worship" as limited to a "building or edifice" which is "primarily used for religious worship" and the land, such as a parking lot, which is essential to the functioning of that building. § 39–3–101(1)(e). The statute is narrow and specific in what it covers. It is directed at buildings and the property which is nearby or immediately adjacent to the building. Several specific types of buildings are described as coming within the exemption including "retreat houses" or "houses used primarily for religious reflection." *Id.*

The merits of Young Life's claim to a tax exemption under this statute must be analyzed in light of some basic principles regarding the application of tax exemptions. First, "the firmly established rule is that the presumption is against tax exemption, and the burden is on the one claiming the exemption to establish clearly his right thereto." *United Presbyterian Ass'n v.*

---

1. The full text of the religious worship provision is as follows:

 The following shall be exempt from general taxation under the provisions of articles 1 to 13 of this title:

 . . . . .

 (e) Property, real and personal, that is owned and *used* solely and exclusively for religious worship and not for private or corporate profit. The exemption contemplated in this paragraph (e) shall be limited to any building or edifice and the personal property located therein which is *primarily used* for religious worship, and any land which is essential to the functioning of said edifices, or to meet zoning standards and building requirements, or provide parking for such building or edifice, together with convents for religious women of all denominations, monasteries for religious men of all denominations, houses used solely for ecclesiastical administration, and houses *used primarily* for religious reflection by lay men and women of all denominations, commonly known as retreat houses.

 § 39–3–101(1)(e) (emphasis added).

*Board of County Comm'rs,* 167 Colo. 485, 496, 448 P.2d 967, 972 (1968).

· The second basic principle is that exemptions are to be granted on the basis of the property's *actual use. See, e.g., United Presbyterian Ass'n,* 167 Colo. at 493, 448 P.2d at 971 ("use, rather than ownership, is the well-established test of exemption from taxation"); *Roberts v. Ravenwood Church of WICCA,* 249 Ga. 348, 351, 292 S.E.2d 657, 659 (1982) ("whether property qualifies for a tax exemption as a place of religious worship is determined by looking to the primary use of the property"). In Colorado, all real property is subject to *ad valorem* taxation except that which is expressly exempted by law on the basis of its usage. *See* § 39–1–102(16), 16B C.R.S. (1982) (all property is taxable unless expressly exempted); §§ 39–3–101 to 39–3–112 (outlining property uses which qualify for tax exemptions).

In this case, I cannot agree with the majority's expansive application of the religious worship exemption to cover the entirety of the property included in Young Life's exemption request, over 1,100 acres. The exempted property includes over 300 acres which apparently are never used by Young Life campers, over 100 acres which are used solely to graze horses and cattle, some 20 acres containing two mining claims, and 42 acres containing a motel which is open to the public. Moreover, evidence in the record indicates that large portions of the subject properties are vacant lands which are not primarily used by Young Life for any purpose.

#### B.

The majority apparently applies the religious worship exemption in such an imprecise manner because it seeks to avoid "any detailed governmental inquiry into or resultant endorsement of religion that would be prohibited by the establishment clause of the first amendment to the United States Constitution." Maj. op. at 1333 n. 21. It is true that, in the context of applying the religious worship exemption, the court ·must tread carefully between the First Amendment's Establishment Clause

and the Free Exercise clause to avoid both excessive government entanglement with religion and inhibition of the free exercise of religion. Yet this potential for implicating First Amendment concerns does not relieve the court of its responsibility to examine carefully the actual use of the property to determine if that use constitutes religious worship. *See Tilton v. Richardson,* 403 U.S. 672, 91 S.Ct. 2091, 29 L.Ed.2d 790 (1971) (Supreme Court did not hesitate to inquire into the specifics of activities conducted in church-related schools to determine if such activities constituted religious worship).

The First Amendment presented no bar to this court in *Young Life v. Division of Employment & Training,* 650 P.2d 515 (Colo.1982), in which we undertook a thorough analysis of the purpose and operation of the Young Life organization to determine if Young Life was a "church" for purposes of the unemployment tax exemption for churches. In that case, we determined that Young Life was not a church within the meaning of the unemployment tax statute, and we emphasized that "[a]ny tax exemption for religious organizations entails an examination of whether a particular group or organization meets the statutory requirement for exemption." 650 P.2d at 523.

Further, I suggest that the majority's unwillingness to define the religious worship exemption is more likely to cause first amendment problems than it is to avoid them because there are no standards for administrative enforcement. Colorado statutes and case law have not specifically defined the term, and testimony in this case established that the Administrator has no written guidelines regarding the application of the exemption. Historically, the application of the religious worship exemption by the Board and the Administrator to church-owned camp or resort properties has been widely varying and inconsistent. For example, the record discloses that, under the religious worship provision, the Administrator granted the Beaver Creek Camp Commission's exemption request for the property which the organization uses

"for the purpose of promoting Christian education, recreation, and social welfare of the youth." However, the Administrator denied an exemption for the property owned by Youth With a Mission, a religious organization which uses the property for a youth and family camp to further its purpose of "promot[ing] the gospel of Jesus Christ throughout the world." The potential for arbitrary enforcement of the religious worship exemption will go unchecked without guidance from this court.

The majority's failure to provide a workable definition of religious worship leads to other problems. First, the lack of a definition causes the majority to give undue deference to the Board's findings. It is true that a reviewing court should give deference to an agency's expertise and its resolution of factual issues. *Board of Assessment Appeals v. Colorado Arlberg Club*, 762 P.2d 146 (Colo.1988). However, it is the court's responsibility to interpret the law. Deference is neither required nor appropriate when an agency has applied the wrong legal standard or when it has applied no discernable legal standard at all.

Second, without a definition of religious worship, the majority unquestioningly accepts Young Life's contention that all of its activities are religious worship. The majority opinion opens the possibility that any religiously-oriented organization may obtain an exemption for all its properties by merely asserting, as Young Life has done here, that its use of the property is inherently religious and thus constitutes "worship." *See Columbus, Georgia, by Board of Tax Assessors v. Outreach for Christ, Inc.*, 241 Ga. 2, 4, 243 S.E.2d 42, 45 (1978) (Hall, J., dissenting) (warning that defining "religious worship" too broadly results in a tax exemption for any property upon which "the celebrants conduct roving homage to the deity over the entire tract during some part of the tax year").

Such concerns point up the need for this court to delineate the proper standard by which a property tax exemption for religious worship is granted. To this end, I offer the following clarification of the meaning and application of the religious worship exemption.

## C.

The term "religious worship" is not defined in the Colorado constitution or statutes, and thus the court should construe the term in a manner which gives the words their plain and ordinary meaning. *AT & T Communications v. State*, 778 P.2d 677, 683 (Colo.1989); *People v. District Court*, 713 P.2d 918 (Colo.1986). *Webster's* defines "religious" as "committed, dedicated, or consecrated to the service of the divine; set apart to religion." *Webster's Third New International Dictionary* 1918 (1986). "Worship" is defined as the "reverence or veneration tendered a divine being or supernatural power; *also:* an act, process, or instance of expressing such veneration by performing or taking part in religious exercise or ritual." *Id.* at 2637. These common definitions of "religious" and "worship" are consistent with the testimony of the former supervisor of the exemptions section for the Administrator who testified that he understood "religious worship" to be "an expression of religious belief in a formalized manner."

In like manner, other jurisdictions which have defined "worship" in the context of property tax exemption for church-owned property have held that everyday informal activities do not constitute worship. *See, e.g., Faith Fellowship Ministries v. Limbach*, 32 Ohio St.3d 432, 513 N.E.2d 1340, 1343 (1987) (worship is "not the everyday activities of an individual which express devotion to his or her God."); *see also Davies v. Meyer*, 541 S.W.2d 827 (Texas 1976) (outlining differences between use of property for religious *worship* and use of property for merely religious *purposes*); *Leggett v. Macon Baptist Ass'n. Inc.*, 232 Ga. 27, 205 S.E.2d 197 (1974) (same).

Thus, I would hold that the religious worship exemption applies to exempt only that property which is set aside, committed, or consecrated for the performance of religious exercise or ritual, and which is used primarily for that purpose. Equipped with

this definition, I next apply it to the facts presented by this case.

### D.

The evidence in this case must be examined to determine whether the actual use of the property in tax year 1984 entitles property owner Young Life to the "religious worship" tax exemption. Because the Property Tax Administrator did not have standing to appeal before 1984, the only relevant evidence in this case pertains to the use of the property in 1984. The property at issue includes four named parcels: Trail West resort, Rancho Caballo horse ranch, Frontier Ranch camp, and Silver Cliff camp. The Board found that the Trail West resort and the Frontier Ranch and Silver Cliff camps were "retreat houses." Its basis for exempting the Rancho Caballo property is unclear but apparently the Board concluded that it was exempt because Young Life operated the properties as "a unit." I will examine each property in turn.

### 1.

Young Life's request to exempt the property known as Trail West includes 42 acres surrounding the Trail West resort cabins and 20 acres of two mineral claims. The Trail West resort is used by various religious groups including Young Life, but it is also open to the public in general as a motel. Since 1979, groups which have utilized the facilities at Trail West include such non-religious groups as the Republican Women's group, Garden Club of Buena Vista, State Reformatory Staff, Buena Vista Peace Officers, Chamber of Commerce, Gateway Girls Soccer, Petro Lewis, and the Colorado State Forest Service. Individual members of the public, not affiliated with a group, also stay at the resort as paying customers. Although there are no statistics in the record regarding the actual use of the Trail West resort in 1984, we know from the record that in 1983 less than 30% of the use of Trail West resort was made by Young Life groups, and that from 1977 to 1983, the predominant users of the resort were not affiliated with Young Life.

The promotional brochure on Trail West in the record describes Trail West as a mountain resort for a "leisurely vacation," featuring horseback riding, archery, billiards, swimming, and jeep rides, with no mention in the brochure of any religious activities. The 1984 brochure promoted "Sun and Fun" family vacations at Trail West and solicited reservations for various periods during June through August 1984. When the field examiner for the Property Tax Administrator's office viewed the site in August, 1984, she observed guests engaged in ordinary recreational activities. She was unable to locate any building or area which was designated as a chapel, and found no religious symbols or articles anywhere on the property.

Young Life included the Mercury # 1 and # 2 mining claims in its request for exempting the Trail West property. The twenty acres comprising the two mining claims are situated on a steep slope over a mile from the Trail West lodge, and are accessible by a very steep, rugged, narrow trail. When the field examiner viewed the area around the mining claims, she found little or no evidence of use of that area by anyone. No evidence in the record indicates that the mining claims or any particular area on the Trail West property were set aside for the performance of religious exercise or ritual or used for religious reflection so as to qualify the property for a tax exemption under section 39–3–101(1)(e).

### 2.

Young Life's request for an exemption for the Rancho Caballo property consists of a 355 acre tract which is not contiguous with the other properties owned by Young Life. Part of the property essentially is used for a ranching operation for the raising, buying and selling, and grazing of horses. A large portion of the property is not used for horseback riding or for grazing, but is simply unimproved mountainous land. While inspecting the property in August 1984, the field examiner for the Administrator observed five or six cattle and several horses grazing on the property but found no evidence that the property was

used by Young Life or anyone for religious purposes. There is no evidence in the record to support Young Life's claim that in 1984 the Rancho Caballo horse ranch was used in any way for religious worship.

3.

Young Life's request for exemption for Frontier Ranch camp includes a large tract of land covering 696 acres. Eighty acres of this amount is not adjacent to the remainder of the property but is situated one mile east of the other parcel. In its request to exempt the property, Young Life excluded four mineral claims on the property as well as the property of the residence of the Frontier Ranch manager. Young Life also requested an exemption for the 96.7 acres which comprise its Silver Cliff camp, excluding the land surrounding the manager's residence and the apartment of the superintendent. In May of 1984, Young Life sold a large portion of the Silver Cliff property and consolidated the remainder of Silver Cliff with Frontier Ranch camp. Because of the similarity of Young Life's use of these properties as youth camps, they will be discussed together.

When the Board of Assessment Appeals granted Young Life's request to exempt the Silver Cliff and Frontier Ranch camps, it relied heavily on Bishop Frey's testimony regarding Young Life's philosophy that religious worship includes all the activities which occur during Young Life's camp sessions. Bishop Frey testified that the camp activities were undertaken in the context of Christian ministries and thus constituted the "totality of worship in the best sense of the word." Bishop Frey, of course, was not presented as a legal expert and did not relate his concept of worship to the constitutional and statutory provisions. Notwithstanding Bishop Frey's evident sincerity and his expertise on the theological orientations and the evangelistic techniques of Young Life, he provided no relevant evidence on the actual use of the properties

in 1984. Bishop Frey's experience with the properties was based on a week-long stay at the Trail West lodge three years earlier in 1981. There was no testimony to suggest that the use of the camp properties was the same in 1984 as it was in 1981. On the contrary, the statistical evidence presented regarding the camps' usage from 1976 to 1983 indicates that the usage varied widely from season to season and from year to year. Young Life's use of the camps generally has been concentrated in the three summer months while other groups have tended to use the camps in the remaining nine months. For example, at Frontier Ranch camp in 1976, less than 6% of the "camper days" [2] during the fall, winter, and spring were used by Young Life. The comparable figure for Young Life's use of the camp during the non-summer months of 1983 was 54% of the "camper days." At Silver Cliff camp, 83% of the total annual "camper days" were attributed to Young Life campers in 1976, while in 1983, the percentage of Young Life campers had dropped to 56%.

However, even if Young Life had presented relevant evidence regarding its use of the properties in 1984, and even if Young Life was the primary user of the property (both propositions which are not conclusively shown in the record), I do not believe that the everyday recreational activities conducted at the camps meet the statutory standard of being primarily used for religious worship.

No Colorado case has held that a religious organization's recreational camp activities, such as the horseback riding, swimming, and billiards playing which occur on Young Life's properties, qualify the land as tax exempt on the basis of the religious worship exemption. In *West Brandt Foundation, Inc. v. Carper*, 652 P.2d 564 (Colo.1982), this court refused to grant a property tax exemption under the religious worship provision to the Singin' River Ranch, property which was owned and used by a religious organization very similar to Young Life. In *West Brandt*, the

---

**2.** "Camper days" is a statistical measure of the usage of the camp which is equal to the number of campers who used the camp multiplied by

the number of days each camper spent at the camp.

president of the West Brandt Foundation testified that the organization's use of the camp was to further its overall objective of "get[ting] more people to live the Christian life." 652 P.2d at 566. In a manner similar to Young Life camps, the property in *West Brandt* was used for a summer camp known as Christian Life Adventure Camp, a program with the primary focus on promoting Christianity among young people. Noting that the camp was also open to use by groups without a particular religious program, this court held that the Singin' River Ranch was "clearly not a place of religious worship," and summarily dismissed the claim for a religious worship tax exemption. 652 P.2d at 569.

Other jurisdictions which have considered tax exemptions for church camps have reached a result similar to that in *West Brandt.* The Supreme Court of Texas in *Davies v. Meyer,* 541 S.W.2d 827 (Texas 1976), denied a tax exemption to a 155–acre church camp whose activities included "wholesome church camp programs" essentially identical to the activities at issue in this case. The court noted that some of the property was used for church services as well as educational and recreational activities, but that the majority of the acreage was "natural vacant land." 541 S.W.2d at 829. After considering the actual use of the property together with the religious organization's evangelistic purpose in using the camp the court concluded:

> Certainly inspiration and a spirit [of] renewal may be captured by experiences with nature and the wilderness, but those experiences can also qualify as *wholesome recreation which falls short of religious worship.*

*Davies v. Meyer,* 541 S.W.2d 827 (Tex.1976) (emphasis added).

In like manner, the Supreme Court of Ohio, in *Moraine Heights Baptist Church v. Kinney,* 12 Ohio St.3d 134, 465 N.E.2d 1281 (1984), denied a tax exemption for all but a limited area of a 49–acre church camp. The court explained,

> the record fully supports the [Board of Tax Appeal's] denial of an exemption for

appellant's outdoor facilities, including the swimming pool, basketball and shuffleboard courts, as well as the remaining unimproved areas of the church camp. Although appellant contends those areas are vital to the camp for the purpose of entertaining youth in an atmosphere in which worship is the primary goal, nevertheless, this portion of the church camp does not qualify for an exemption.

*Id.* 465 N.E.2d at 1283. *See also Christian Camps & Conferences, Inc. v. Town of Alton,* 118 N.H. 351, 354, 388 A.2d 187, 189 (1978) (camp properties which were used for programs emphasizing evangelism and Christian education not entitled to religious exemption because main activity on property was summer camp, with religious activity subordinate to camping activity).

The majority cites only one case as upholding a property tax exemption for a church camp. *Kerrville Ind. School Dist. v. Southwest Texas,* 673 S.W.2d 256 (Tex. App. 4 Dist.1984). Unlike the present case, the land found to be exempt included a chapel, an outdoor chapel and crosses. Even that case, however, refused to exempt unimproved lots located across a public road from the main camp because it contained no actual places of worship:

> In this case, we find no probative evidence that the lots were used in any capacity other than to further the atmosphere of the rustic hill country. This does not, standing alone, rise to an actual place of worship.

*Id.* at 261.

The majority upholds Young Life's tax exemption by embracing the Board's conclusion that any nonreligious aspects of Young Life's activities were incidental to religious worship, relying principally on *General Conference v. Carper,* 192 Colo. 178, 557 P.2d 832 (Colo.1976). Maj. op. at 1331–32. As the facts of that case indicate, however, "incidental" for these purposes does not mean tangential or indirect. In *General Conference,* the issue concerned a property tax exemption for a printing plant used to publish religious tracts. This court noted the "intimate and historic" relationship between religious literature and religious worship and found a direct connec-

tion between the printing activities and the religious worship exemption. *Id.* at 182, 557 P.2d at 834–35. Earlier cases similarly limited the "incidental" concept to property uses which are "indispensable" to the exempt purpose or "reasonably necessary" and "used solely for that purpose." *Kemp v. Pillar of Fire*, 94 Colo. 41, 49, 27 P.2d 1036, 1037 (1933) (quoting in part, *Bishop v. Treasurer of Arapahoe County*, 29 Colo. 143, 68 P. 272 (1901)).

The majority cuts the "incidental" use loose from its moorings. I cannot accept, for example, that Rancho Caballo is tax exempt as incidental to religious worship because Young Life wants to raise its own horses in order to ensure that its campers will have safe, gentle rides. Maj. op. at 1329. The religious worship exemption loses all meaning if this approach is correct.

### E.

In addition to holding that the Young Life properties are not eligible for the religious worship tax exemption, I would also find that the properties do not qualify for an exemption under the "strictly charitable purposes" provision of section 39–3–101(1)(g), 16B C.R.S. (1982 & 1988 Supp.). Evidence in the record shows that less than 5% of the campers at Young Life received scholarships, and that from 1976–1983 the large majority of people using the properties were non-Colorado residents. *See West Brandt Foundation, Inc. v. Carper*, 652 P.2d 564 (Colo.1982) (religious organization's request for tax exemption under "charitable purposes" provision denied); *United Presbyterian Ass'n v. Board of County Comm'rs*, 167 Colo. 485, 448 P.2d 967 (1968) (same); *Young Life Campaign v. Board of County Comm'rs*, 134 Colo. 15, 300 P.2d 535 (1956) (same).

### F.

In conclusion, I would hold that Young Life's primary uses of its properties fail to qualify the properties for a tax exemption under the religious worship provision. Trail West lodge operates essentially as a motel which is open to the public and not primarily used by Young Life. It is used as an ordinary resort and does not qualify under the statute as property which has been set aside to be used primarily by Young Life for religious exercise or ritual. As such it should not be exempt from taxation under the religious worship provision. As for the Rancho Caballo ranch property, much of it is used to graze horses, while a large part of the property does not appear to be used by Young Life at all. Clearly, using the land to graze horses does not comply with the statutory standard of being used "solely and exclusively for religious worship." The Frontier West and Silver Cliff camp properties are used primarily for recreational camping activities. Even though some of these activities may occur in the context of religious evangelizing, they do not meet the statutory standard.

In my view, Young Life has not presented adequate evidence to meet its burden of proof to establish that it is entitled to a tax exemption on the basis of the religious worship provision for the 1,100 acres which it owns in Chaffee County. I would agree with the decision reached by the Administrator who, after an in-depth review of the evidence in this case on two separate occasions, concluded, "the evidence clearly reveals that the described property is not owned and used solely and exclusively for religious worship or for strictly charitable purposes within the context of the constitution and statutes." I would deny in its entirety Young Life's request for an exemption for its properties for 1984.

I am authorized to say that JUSTICE ROVIRA and VOLLACK, J., join in this concurrence and dissent.